# IN THE COURT OF APPEALS OF IOWA

No. 21-0420
Filed July 21, 2021

**IN THE INTEREST OF J.W.,**
**Minor Child,**

**M.P., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Montgomery County, Jennifer Bahr,
District Associate Judge.

A mother appeals the termination of her parental rights to a seven-year-old
daughter. **AFFIRMED.**

Ivan E. Miller, Red Oak, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant
Attorney General, for appellee State.

DeShawne L. Bird-Sell of Sell Law, P.L.C., Glenwood, attorney and
guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., Greer, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2021).

**BLANE, Senior Judge.**

Mia appeals the termination of her parental rights to her seven-year-old daughter, J.W. Because Mia does not challenge the full statutory grounds for termination, she has waived any claim related to the proof meeting those grounds. She also contends it was not in J.W.'s best interests to terminate, termination is detrimental due to the parent-child bond, and the court should have given her additional time. We affirm.

## I. FACTS AND PRIOR PROCEEDINGS

J.W. was originally removed from Mia's care in February 2019 due to Mia's substance abuse—Mia used both methamphetamine and marijuana. J.W. tested positive for methamphetamine. The department of human services (DHS) investigated and founded a child abuse report naming Mia as the person responsible. The court placed then-five-year-old J.W. with a foster family. But her troubling behaviors led the DHS to place her in a youth shelter. In May 2019, DHS placed J.W. with a foster parent who is also a paraprofessional at her school. She has lived with the foster parent since that time.

At the time of the removal, Mia lived with Bradley, a sex offender. She and Bradley married during the open child-in-need-of-assistance (CINA) case. Later they separated, and Mia started living with a new paramour, Chris. She struggled with sobriety throughout the case. She reported relapsing in August 2019, February 2020, and then again in December shortly before the termination hearing. Although ordered to seek substance-abuse therapy and mental-health counseling, Mia did not engage in treatment until spring 2020. Her first few attempts at therapy ended due to missed appointments. She restarted therapy just before the

termination hearing, attending approximately two out of every three sessions. She also stated she started medication management for her mental-health prescriptions.

The same pattern occurred with the ordered substance-abuse treatment. After fits and starts, Mia began treatment in spring 2020 with inconsistent attendance due to various issues including COVID-19 quarantines and a lack of transportation. The court also ordered Mia to obtain drug testing. In 2020, she had twenty-seven scheduled screens. Of them, only two came back negative. She tested positive for THC twice, the last time in August 2020. In September, her urine sample was too dilute to test, and she refused to submit a hair sample. On thirteen other occasions, Mia did not take the requested test for various unexcused reasons. Just before the termination hearing, she recommenced substance-abuse treatment and anticipated she would graduate.

In the meantime, Mia divorced Bradley and got engaged to Chris in May 2020. In October, Chris was arrested for child endangerment causing bodily injury regarding his own child. The DHS also founded a child abuse assessment finding he was responsible. Mia was charged with interference with official acts during that incident. And Mia continued to live with Chris after his release from jail. He also has substance-abuse issues and tested positive for marijuana or THC five times during the case.

Mia currently lives with Chris at a friend's home. The friend has not been approved to be around J.W. The DHS was not able to conduct a background check on the friend because he did not return some requested paperwork. Chris has an open CINA case regarding his child as well, and Mia acknowledges he

would not pass a background check. Mia had been employed at a fast food restaurant but had not been working since the onset of the COVID-19 pandemic.

J.W. has several mental-health and physical impairments and developmental delays. After the removal, J.W. began seeing a therapist who opined she experienced "severe emotional neglect" while living with her mother. Following a checkup in February 2020, at a children's psychiatric clinic, the provider reported then six-year-old J.W. demonstrated significant impulsiveness, disruptive behaviors, and unintelligible speech. The provider also reported Mia missed J.W.'s appointments and did not follow medication orders regarding J.W.

At the outset, DHS offered Mia two supervised visits with J.W. each week. Before the COVID-19 pandemic, the visits were in the community due to Mia living with Bradley. Then they were moved to telephone and video conferences. But phone visitation did not go well. The therapist noted J.W. is not able to talk the entire allotted time and stops paying attention. She began displaying negative behaviors after those visits, which troubled the foster parent and therapist. Mia also brought up inappropriate subjects during phone visitation. She told J.W. she was sick with COVID-19 and that she might be pregnant. She discussed J.W. coming home and put J.W.'s stepbrother on the phone, which made J.W. uncomfortable. Mia also put J.W.'s biological father—who has had no contact with her for four years[1]—on the phone during a visit.

---

[1] The father had one phone call with a DHS worker and was encouraged to participate. But by this time, he was living in Texas and did not engage with the CINA proceedings. The juvenile court terminated his parental rights as well, and he did not appeal.

In May 2020, the therapist recommended visits be moved to a therapeutic environment to increase positive parent interactions.  And Mia set up several therapeutic visits.  But she cancelled three of the four for different reasons. Consequently, she had no visits with J.W. between May and September.  After the late-September therapeutic visitation, the DHS worker reported J.W. "displayed extreme negative behaviors—harming self by picking scabs, pulling out hair, eyelashes, noncompliance, [and] anger directed at others."  On the guardian ad litem's (GAL) motion, the court ordered visits be at the discretion of DHS, the GAL, and the therapist.  They chose to suspend visits altogether.  The therapist and DHS workers opined continued contact with Mia would be detrimental to J.W. and her progress toward mental stability.

J.W. has been doing well in the care of the foster parent.  Her psychiatric provider notes J.W. has shown significant improvement in her speech and behaviors and the foster parent has followed through with all recommendations and attended appointments as scheduled.  The therapist noted J.W.'s "affect has changed from . . . bland to responsive" and she had "improved the ability to organize her thoughts and recall activities she has done and names of people she has interactions with."  The foster parent reported J.W. is "singing songs, playing more with other children and telling stories of her experiences" to the foster parent. The DHS worker observed a "very obvious" bond between J.W. and her foster parent.

Seeing little improvement and little prospect of reunification, the State filed a petition to terminate Mia's parental rights in November 2020, and the juvenile court held a termination hearing in January 2021.  The court found the State proved

the statutory grounds for termination under Iowa Code section 232.116(1), paragraphs (e) and (f) (2020).  Mia appeals.

## II.  SCOPE OF REVIEW

"We review child-welfare proceedings de novo."  *In re A.H.*, 950 N.W.2d 27, 33 (Iowa Ct. App. 2020).  "The juvenile court's fact findings do not bind us, but we give them weight, particularly with regard to credibility."  *Id.*  Our primary concern is the best interests of the child.  *Id.*

## III.  ANALYSIS

### A.  Statutory grounds for termination

The juvenile court found grounds for termination under Iowa Code section 232.116(1)(e) and (f).  Mia challenges the juvenile court's finding under paragraph (e) but not under paragraph (f).[2]  When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the order on any ground we find supported by the record.  *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).  A parent's failure to raise the remaining statutory ground for termination waives any claim of error related to those grounds.  *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) (finding "our review is confined to those propositions relied upon by the appellant for reversal").  Because Mia does not challenge the statutory ground

---

[2] Proof of that ground requires clear and convincing evidence of the following:

    1. The child is four years of age or older.

    2. The child has been adjudicated a child in need of assistance pursuant to section 232.96.

    3. The child has been removed from the physical custody of the child's parent for at least twelve of the last eighteen months . . . .

    4. There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.116(1)(f).

under paragraph (f), she waives any related challenge and the juvenile court's findings on paragraph (f) stand. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

### B. Best interests

In making the best-interests determination, we give primary consideration to the child's safety; the best placement for furthering their long-term nurturing and growth; as well as their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); *see P.L.*, 778 N.W.2d at 37. Safety and the need for a permanent home mark the "defining elements" in a child's best interests. *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially).

We find clear and convincing evidence that it is in J.W.'s best interests to terminate Mia's parental rights. Mia has not made significant progress in the case substance-abuse and mental-health goals. She is still suffering from addiction, given that she tested positive several times while the CINA and termination were pending. She admitted to relapsing with methamphetamine at several points, including shortly before the termination hearing. She also admits J.W. cannot be returned to her at this time. She lacks a safe home and stable job. Those conditions continue to pose a risk to J.W.'s safety and therapeutic progress.

Mia argues COVID-19 restrictions made it difficult for her to comply with services. But the testimony of the DHS workers and other documents in the record show Mia was able to attend appointments by telephone and video conferencing and that some services, such as drug testing, were brought to her home. Also, Mia's noncompliance with the core case goals long preceded the onset of COVID-19. At the termination hearing, J.W. had been out of parental care for twenty-three months, and obtaining a permanent home has become a matter of urgency. It is

in J.W.'s long-term best interests to terminate Mia's rights and seek a permanent adoptive home for J.W., possibly with her current placement. Providers have seen a marked improvement in J.W.'s health and mental well-being since she has been in the foster parent's care. J.W. is bonded to the foster parent, who understands her needs and cares for her diligently. The foster parent wants to adopt J.W. We conclude it is in J.W.'s best interests to terminate Mia's parental rights.

### C. Detriment due to parent-child bond

Next, Mia asks the court to apply a statutory exception under section 232.116(3) to forego termination. She cites paragraph (c) for when "termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." *See* Iowa Code § 232.116(3)(c). But application of these statutory factors is permissive, not mandatory. *See In re A.R.,* 932 N.W.2d 588, 591 (Iowa Ct. App. 2019).

We do not find the record supports exercising this statute to prevent termination. J.W. has not been in Mia's care for twenty-three months. J.W.'s therapist opined that further contact with her mother would be detrimental to J.W. based on the negative and self-harming behaviors she exhibited after their last contact. When the therapist requested Mia continue visitation in a therapeutic setting, Mia cancelled all but one visit. As a result, Mia did not see J.W. for four months. Afterward, the therapist recommended suspending all visitation due to the extreme negative reaction a single visit evoked in J.W. On that background, we cannot conclude termination of Mia's rights would be detrimental to J.W.

**D. Additional time**

Finally, Mia asks for an addition six months to work toward reunification. To grant an extension of six months, under Iowa Code section 232.104(2)(b), the court must determine the need for removal will no longer exist at the end of that time. *In re A.A.G.*, 708 N.W.2d 85, 89 (Iowa Ct App. 2005). We do not find such evidence exists in this case. Mia has had almost two years to address her significant substance-abuse and mental-health issues, and has made insufficient progress on those goals. She also continues to live with her paramour who had his own child removed and was charged with child endangerment causing injury. Their home is in the basement of a man who she admits has an alcohol-abuse problem and mental-health conditions. There is not enough evidence in the record to conclude that Mia, at the end of six more months, will have a stable home and job and be free of substances such that J.W. would remain safe from adjudicatory harm in her care.

We find no grounds to reverse the juvenile court and affirm termination of Mia's parental rights.

**AFFIRMED.**